**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 23-3202

———————

COINBASE, INC.,

Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION

———————

On Petition for Review of Securities and Exchange
Commission Order (No. 4-789)

———————

Argued on September 23, 2024

Before: BIBAS, FREEMAN, and AMBRO, *Circuit Judges*

(Filed January 13, 2025)

Eugene Scalia [**ARGUED**]
Jonathan C. Bond
D. Nicholas Harper
GIBSON, DUNN & CRUTCHER LLP

1050 Connecticut Avenue, NW
Washington, DC 20036
    *Counsel for Petitioner*

Tracey A. Hardin
David D. Lisitza
Ezekiel L. Hill [**ARGUED**]
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
    *Counsel for Respondent*

Kyle D. Hawkins
LEHOTSKY KELLER COHN LLP
408 West 11th Street
5th Floor
Austin, TX 78701
    *Counsel for Amicus-Petitioner Paradigm Operations LP*

Jeremy M. Creelan
Kayvan B. Sadeghi
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036

Michelle Kallen
STEPTOE LLP
1330 Connecticut Avenue NW
Washington, DC 20036
    *Counsel for Amicus-Petitioner Crypto Council for Innovation*

Eric Tung
JONES DAY
555 South Flower Street
50th Floor
Los Angeles, CA 90071
*Counsel for Amicus-Petitioner Chamber of Commerce of the United States of America*

Frank Scaduto
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
*Counsel for Amicus-Petitioner Satoshi Action Fund and Texas Blockchain Council*

## OPINION OF THE COURT

AMBRO, *Circuit Judge*

Coinbase Global, Inc., a trading platform that facilitates the exchange of digital assets, petitioned the Securities and Exchange Commission (SEC) to promulgate rules clarifying how and when the federal securities laws apply to digital assets like cryptocurrencies and tokens. Coinbase argued in its petition that the existing securities-law framework does not account for certain unique attributes of digital assets, which make compliance economically and even technically infeasible. It also asserted that the SEC has exacerbated these difficulties by failing to articulate a clear and consistent position about when a digital asset is a security, and thus subject to the federal securities laws at all.

The SEC denied Coinbase's rulemaking petition. In a single paragraph, it explained that it disagreed with the petition's concerns; that it had higher-priority agenda items—namely, everything else it was doing; and that it may prefer to gather additional information through incremental action before engaging in more far-reaching rulemaking. Coinbase's U.S. subsidiary, Coinbase, Inc., petitions us to review the SEC's denial.

Before us is whether the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, or other principles of administrative law require the SEC to engage in notice-and-comment rulemaking and, if not, whether the SEC's explanation for its decision was sufficiently reasoned. Because we believe the

4

SEC's order was conclusory and insufficiently reasoned, and thus arbitrary and capricious, we grant Coinbase's petition in part and remand to the SEC for a more complete explanation. But we decline at this stage to order the agency to institute rule-making proceedings.

## I. BACKGROUND

### A. What Are Digital Assets?

Coinbase is a trading platform for digital assets. They come in many forms—coins and tokens are the most popular—but their common attribute is that they are issued and transferred using a "blockchain," which is essentially a decentralized public ledger spread across a network of many computers. *See What Is Blockchain?*, IBM, https://perma.cc/5C8Y-ET76. Unlike banks, which hold a single authoritative version of a ledger, every participant on a blockchain network holds a copy of the full chain of transactions. All computers in the network digitally record each transaction in data packages called "blocks." Each block contains a set of transaction records, including a timestamp and a reference to the previous block in the sequence. To verify a transaction, another block irreversibly joins the chain of all previous transactions—hence, blockchain. Every new transaction increases the reliability of the ledger because "[e]ach additional block strengthens the verification of the previous block and hence the entire blockchain." *Id.*

To achieve agreement among all users about the state of the ledger and to prevent tampering, blockchains use protocols called "consensus mechanisms." Parma Bains, Int'l Monetary Fund, *Blockchain Consensus Mechanisms: A Primer for Supervisors* 3 (2022), https://perma.cc/PEK9-D5RL. Consensus mechanisms also come in many forms, but they all work by

5

using written decision rules requiring some amount of computing power to verify that certain conditions have been met without the need for human middlemen. *Id.* at 4 ("Consensus in distributed systems is ensuring that a state, value, or piece of information is correct and agreed on by most nodes. A consensus mechanism guarantees this effort is carried out fairly and independently of any interested party …."). To incentivize participants to lend their computing power to verify each transaction, blockchain networks often reward participants with "coins." *See id.* at 9 ("[T]he concept of rewarding active nodes with crypto assets is replicated in many other consensus mechanisms.").

Take Bitcoin—the most popular blockchain network—as an example. It uses a consensus mechanism called "proof of work." *Id.* at 8–10. After each transaction, participants in the network use enormous amounts of computing power to solve a difficult computational problem. The first to solve the problem earns a set number of "bitcoins"—the coin generated by the Bitcoin network. *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* 2, 4 (2008), https://perma.cc/59ZY-QPG5.

Blockchains can also support "tokens." Unlike coins, tokens are issued not by the blockchain itself but by programs supported by the blockchain called "decentralized applications." Andrew Loo, Corp. Fin. Inst., *Types of Cryptocurrency* (2023), https://perma.cc/Q236-KQZ2. Tokens vary widely and serve many purposes. For example, there are utility tokens, which pay for specific services on decentralized applications; governance tokens, which grant governance rights over a

6

project; and security tokens, which represent ownership of some other, usually more traditional, asset. *Id.*

The core innovation of a blockchain network is decentralization. In a mature blockchain network, verifying transactions, issuing coins, and using tokens do not require oversight by a central authority or participation by human intermediaries. *Blockchain & Distributed Ledger Technologies*, GAO (Sept. 2019), https://perma.cc/KUT3-LVGX. But this feature, which proponents of blockchain technology hail as its primary virtue, has run up against a major obstacle—the federal securities laws.

### B.    The Federal Securities Laws and Digital Assets

The SEC brought its first enforcement actions involving digital assets in the early 2010s.[1] These were typically fraud actions that incidentally involved bitcoin. *See, e.g.*, *SEC v. Shavers*, No. 4:13-cv-416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014). Not until 2017 did the SEC start to train its attention on whether digital assets themselves are securities. In July of that year, the SEC issued its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, 2017 WL 7184670 (July 25, 2017) (DAO Report). The DAO was a specific version of a more general concept called a "Decentralized Autonomous Organization." DAO Report at *1. It worked by accepting payments in ether—the coin for the blockchain network

---

[1]    For a list of other SEC enforcement actions against digital-asset firms, see *Crypto Assets*, SEC (Oct. 18, 2024), https://www.sec.gov/securities-topics/crypto-assets.

7

Ethereum—in exchange for special governance tokens. *Id.* at *2–3. These DAO tokens conferred voting rights on members, who could make and vote on project proposals for the DAO to pursue, subject to approval from "Curators" selected by the DAO's creators. *Id.* at *4–5. The holders of these tokens stood to share in the anticipated earnings of those projects. *Id.* at *2.

The SEC referred to the transactions contemplated by the DAO and other undertakings like it as "Initial Coin Offerings" or "Token Sales," *id.* at *7, and explained that tokens resulting from those transactions are securities that must comply with the requirements of the federal securities laws. It "stress[ed] that the U.S. federal securities law may apply to … distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale." *Id.* At a minimum, the SEC claimed that a digital asset is a security, and thus subject to the federal securities laws, if it is an "investment contract." *Id.* at *8 (quoting 15 U.S.C. §§ 77b, 78c). Citing the Supreme Court's decision in *Security & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), the SEC explained that "[a]n investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." DAO Report at *8. The DAO tokens easily satisfied the *Howey* test—the DAO raised money by exchanging ether for special-purpose tokens, and those tokens promised future profits resulting from projects undertaken by the DAO. *Id.* at *8–12.

The DAO Report did not provide a precise formula for determining when a digital asset is a security. It instead emphasized that the definition of investment contract "embodies

8

a 'flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Id.* at *8 (quoting *Howey*, 328 U.S. at 299 (emphasis omitted)). The SEC thus "advise[d] those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and again "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces." *Id.* at *1, *2.

In 2019, the SEC staff produced a more comprehensive framework for analyzing whether a digital asset is an investment contract. *See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets (Digital Asset Framework); *see also Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, Part III, 117th Cong. 1, 11 (2021), https://perma.cc/DR9A-RHB2 (statement of then-Ranking Member of the U.S. House Committee on Financial Services, Rep. Patrick McHenry, noting that "[i]n 2019, SEC staff produced the framework for investment contract analysis of digital assets"). This framework again emphasized that "issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply," and explained that *Howey* provides the touchstone. Digital Asset Framework. The framework provided several more specific "factors market participants should consider

in assessing whether a digital asset is offered or sold as an investment contract and, therefore, is a security." *Id.*

Individual Commissioners and staff members have made public, non-official comments about digital assets as well. For example:

- In June 2018, William Hinman, the SEC's then-Director of the Division of Corporation Finance, stated that a digital asset "all by itself is not a security." William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When* Howey *Met* Gary (Plastic) (June 14, 2018), https://www.sec.gov/newsroom/speeches-statements/speech-hinman-061418.

- In May 2021, the current Commission Chair, Gary Gensler, testified before Congress that "the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission, that could instill greater confidence," and that "only Congress … could really address … bring[ing] greater investor protection to the crypto exchanges." *Game Stopped?* 117th Cong. at 12.

- In August 2021, Gensler told the Aspen Security Forum that he believes "[t]here's actually a lot of clarity" about whether existing securities laws apply to digital assets. Gary Gensler, SEC Chair, *Remarks Before the Aspen Security Forum* (Aug. 3, 2021), https://www.sec.gov/newsroom/speeches-statements/gensler-aspen-security-forum-2021-08-03.

- In December 2022, Gensler told a reporter that he "feel[s] that [the SEC] ha[s] enough authority … in this

space" to regulate digital assets. *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo (Dec. 7, 2022), https://yhoo.it/3EJrqo1. In response to the reporter's comment that he has "repeatedly called on these exchanges to come in and register," Gensler said, "not just register, come into compliance." *Id.*

- In October 2023, Gensler said that "without prejudging any one asset, the vast majority of crypto assets likely meet the investment contract test, making them subject to the securities laws." Gary Gensler, SEC Chair, *Partners of Honest Business and Prosecutors of Dishonesty: Remarks Before the 2023 Securities Enforcement Forum* (Oct. 25, 2023), https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-securities-enforcement-forum-102523.

The SEC expanded its enforcement agenda to digital-asset exchanges in 2023, and in June of that year filed an enforcement complaint against Coinbase. *See* Complaint at 96–100, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. June 6, 2023), ECF No. 1. In its complaint, the SEC alleges that Coinbase, through its trading platform for digital assets, had operated as an unregistered broker, exchange, and clearing agency. *Id.* At the time of our writing, the SEC's enforcement action against Coinbase remains ongoing.

### C.     Coinbase's Rulemaking Petition

In July 2022—before the enforcement action—Coinbase petitioned the SEC to propose new rules addressing how and when digital assets qualify as securities subject to existing

11

securities laws.[2] Coinbase expressed its view that the existing securities-law framework is "fundamentally incompatible with the operation of digital asset securities" and urged the SEC to adopt new rules tailored specifically to digital assets. App. 15. Coinbase identified many purported workability issues, including the following:

- Digital assets have non-investment uses such as "paying transaction, or 'gas' fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network"—uses that would be burdened if digital-asset transactions had to occur within a broker-dealer and registered-exchange framework. App. 18.

- Blockchain networks are decentralized, so there is often no one who can register digital assets or make required disclosures. App. 22–23, 25–26.

- Existing registration and disclosure requirements do not provide owners of digital assets with useful information because those requirements were "designed for traditional corporate entities that typically issue and register equity and debt securities," and "poorly fit the

---

[2] The APA provides that an "agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Similarly, the SEC's Rules of Practice provide that "[a]ny person desiring the issuance, amendment or repeal of a rule of general application may file a petition therefor with the Secretary." 17 C.F.R. § 201.192(a).

12

decentralized and open-source nature of blockchain-based digital asset securities." App. 25.

- Custody rules, which require broker-dealers to maintain "physical possession" or "control" over customers' fully paid and excess-margin securities, "do[] not list holding blockchain private keys as a permitted method of physical possession or control," and "the SEC Staff's general position has been that holding blockchain private keys does not qualify as good physical possession or control," App. 33.

- The "Net Capital Rule," which is "designed to ensure that broker-dealers maintain sufficient unencumbered, liquid capital available at all times to satisfy customer claims promptly," may require companies "that hold custody of customers' digital assets" to record "(i) a liability on their balance sheet for their obligation to return the digital assets, and (ii) an offsetting asset 'similar in nature to an indemnification asset,' but 'separate and distinct from the crypto-asset itself.'" App. 34. According to Coinbase, "the parent company of the broker-dealer would need to contribute a dollar of cash as additional equity into the broker-dealer for every dollar worth of digital asset security custodied by the broker-dealer," which would "be non-economic and unsustainable." *Id.*

About nine months after Coinbase filed its rulemaking petition, it petitioned us for a writ of mandamus ordering the SEC to act on its request. *In re Coinbase, Inc.*, 23-1779 (3d Cir.), ECF No. 1. In June 2023, we ordered the SEC to provide an update on the status of Coinbase's rulemaking petition by October 11, four months hence. *Id.*, ECF No. 32. On that

13

date, the SEC informed us that its staff had made a recommendation to the Commissioners, but that the Commissioners had not yet made a final decision on the petition. *Id.*, ECF No. 33 at 2. Coinbase moved on October 13 for leave to file a response, *id.*, ECF No. 34, which we granted in November, *id.*, ECF No. 35.[3]

The SEC denied Coinbase's rulemaking petition in December 2023. It confined its reasoning to a single paragraph:

> The Commission disagrees with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable. Moreover, the Commission has discretion to determine the timing and priorities of its regulatory agenda, including with respect to discretionary rulemaking such as that requested in the Petition. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). Any consideration of whether and, if so, how to alter the existing regulatory regime may be informed by,

---

[3]  Coinbase claims that this order "suggested that a decision on Coinbase's mandamus petition might be imminent," and that the SEC was moved by this threat. Pet. Br. 17. But the order states only that "[t]he foregoing motion for leave to file a Response to the Court's June 20, 2023 order is GRANTED. Petitioner is instructed to refile the attachment to the motion as its submission no later than Tuesday, November 21, 2023." *In re Coinbase, Inc.*, 23-1779, ECF No. 35.

14

among other things, data and information provided by numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing. Accordingly, the Commission concludes that it is appropriate to deny the Petition. The Commission is also engaged in many undertakings that relate to regulatory priorities extending well beyond crypto asset securities. The requested regulatory action would significantly constrain the Commission's choices regarding competing priorities, and the Commission declines to undertake it at this time.

App. 6 (footnotes omitted).

Coinbase petitions us to review the SEC's decision and asks that we order the SEC to institute a notice-and-comment rulemaking proceeding.

## II.    JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review final orders issued by the SEC under the Securities Act of 1933, 15 U.S.C. § 77i, and the Securities Exchange Act of 1934, 15 U.S.C. § 78y. An agency's order denying a petition for rulemaking is a final order. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Chao*, 361 F.3d 249, 251 (3d Cir. 2004).

We will vacate an agency's order denying a petition for rulemaking if the denial is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA's arbitrary-and-capricious standard, however, "encompasses a range of levels of deference to the agency," *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987), and "denials of petitions to institute rulemaking proceedings … are scrutinized at the most deferential end

15

of the arbitrary and capricious spectrum," *Int'l Union*, 361 F.3d at 254–55; *see also WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981) ("Where … the agency simply declines to initiate any rulemaking procedures, … the scope of judicial review should be extremely limited, if permitted at all.").

This is not to say we will rubber stamp an agency's order. Agency decisions denying petitions for rulemaking are still subject to judicial review, and may be "overturn[ed] … for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017) (internal quotation marks and citation omitted). And as with any other agency order, it must be "reasoned if it is to survive arbitrary and capricious review." *Env't Health Tr. v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021) (internal quotation marks omitted). That means the agency must "adequately explain[] the facts and policy concerns it relied on" and its factual explanation must have "some basis in the record." *Nat. Res. Def. Council v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979).

### III.   WAS THE SEC'S DECISION ARBITRARY AND CAPRICIOUS?

Coinbase argues that the SEC's order was arbitrary and capricious for three reasons. First, the SEC's decision to apply the securities laws to digital assets in enforcement actions constitutes a "significant policy change[]" that "presumptively" requires rulemaking. Pet. Br. 20. Second, the emergence of digital assets removes a fundamental factual predicate underlying the entire existing regulatory framework—that compliance by all potential market participants is possible. And third, the SEC's explanation for its decision was conclusory and insufficiently reasoned. Coinbase argues that if the agency's order

16

was arbitrary and capricious for any of these reasons, then we should order it to institute rulemaking proceedings. We address each argument in turn.

### A. Was the SEC Presumptively Required to Engage in Notice-and-Comment Rulemaking?

Absent a specific congressional mandate, agencies have "broad discretionary powers to promulgate (or not [to] promulgate)" rules. *WWHT*, 656 F.2d at 816 (quoting *Nat. Res. Def. Council*, 606 F.2d at 1045). We afford that discretion because those decisions are "inevitably based, in large measure, on factors not susceptible [of] judicial resolution," like "internal management considerations as to budget and personnel; evaluations of [an agency's] own competence; [and] weighing of competing policies within a broad statutory framework." *Id.* at 817 (quoting *Nat. Res. Def. Council*, 606 F.2d at 1046). An order denying a petition to institute rulemaking proceedings therefore is "scrutinized at the most deferential end of the arbitrary and capricious spectrum." *Int'l Union*, 361 F.3d at 255. If an agency does elect to develop rules, it also has primary discretion in choosing whether to do so through wide-ranging notice-and-comment rulemaking or piecemeal adjudication, or some combination of the two. *See SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 202–03 (1947).

Coinbase argues that, despite this ordinary deference, the SEC's decision here was arbitrary and capricious. By bringing enforcement actions against digital-asset firms, and thus applying the federal securities laws to digital assets, the agency made a "significant policy change[]," Pet. Br. 24, which in Coinbase's view triggered a presumptive obligation to engage in rulemaking. This presumption ensures that an agency like the SEC "provide[s] a cogent explanation for its actions on the record, including its purported legal basis," *id.* at 25;

"consider[s] every 'important aspect of the problem' when exercising policymaking authority," *id.* at 27 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)); and "provide[s] fair notice to regulated parties," *id.* at 28. According to Coinbase, this presumption not only invalidates any digital-asset rules the SEC has developed through enforcement actions; it affirmatively requires the SEC to institute rulemaking proceedings. Coinbase cites no case applying this presumption to *mandate* rulemaking. Instead, it argues that the presumption flows from "[f]oundational principles of administrative law …." Pet. Br. 23–24.

Coinbase also argues that the SEC lacks discretion to formulate policy on digital assets incrementally through enforcement actions because adjudicatory rulemaking is reserved for when the agency "'could not reasonably foresee' the problem"; "lacks 'sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule'"; or confronts a "problem … 'so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.'" *Id.* at 36 (quoting *Chenery II*, 332 U.S. at 202–03). Coinbase believes that none of these special circumstances is present here, so the SEC abused its discretion by purportedly choosing adjudication over notice-and-comment rulemaking and thus "must engage in rulemaking …." *Id.* at 38.

### 1. Is There a Presumption in Favor of Rulemaking?

We first address Coinbase's contention that "[f]oundational principles of administrative law" create a presumption that the SEC must engage in rulemaking regarding digital assets. *Id.* at 23–24.

i.  Explaining the Legal Basis for Agency Action

The first principle Coinbase identifies is that agencies must explain the legal bases for their actions. According to Coinbase, the SEC's enforcement actions are based on a "newly minted understanding of its authority [that] has no basis in the securities statutes," and that "is out of step with almost a century of case law." *Id.* at 30. The SEC can apply existing securities laws to new areas only if it "specifically articulates the purported basis for [its] jurisdiction in advance." *Id.* In Coinbase's view, this requires notice-and-comment rulemaking. *Id.*

We are unpersuaded by Coinbase's claim that notice-and-comment rulemaking is the *only* way an agency can explain the legal basis for its actions. As the SEC emphasizes, an agency bringing an enforcement action must "set[] out its view of the application of the existing law to the facts," and Coinbase, as well as other digital-asset firms, "have the opportunity to argue to the contrary in [the] district court and on appeal." Resp. Br. 39. Coinbase does not explain why this is insufficient.

More fundamentally, Coinbase confuses a ground for setting aside an agency action with a ground for mandating rulemaking. Failure to articulate an adequate legal basis for agency action is the former, not the latter. When an agency fails to articulate an adequate legal basis for its action, the proper course for the regulated entity is to object in the enforcement proceeding, and the proper remedy is to dismiss the action or to vacate or remand the agency's order. This makes sense because it appropriately balances the discretion courts ought to afford agencies to set their own agenda with principles of fair notice and due process.

19

Whether the SEC has articulated adequate legal bases for any of its particular enforcement actions against digital-asset firms is not before us. This is an appeal from an order denying a petition for wide-ranging rulemaking. Given this posture, Coinbase does not object to any specific enforcement actions; it instead claims that the general effort to apply existing securities laws to digital assets is a "sea change." Pet. Br. 20. But if Coinbase believes the SEC's interpretations of existing securities rules lack any basis in law, then it should make those arguments in enforcement proceedings and, if necessary, on appeal, where it can more clearly connect its objection to specific agency actions.

### ii. Considering Important Aspects of the Problem

The second principle Coinbase identifies is that an agency must "contend with all important aspects of its sweeping view of the securities laws" when choosing to engage, or not to engage, in regulatory action. *Id.* at 32 (citing *State Farm*, 463 U.S. at 43).

To begin, the APA requires less engagement by an agency with the views of regulated entities when the agency is considering a petition for rulemaking than it does when the agency has already engaged in notice-and-comment rulemaking. In *State Farm* itself, the National Highway Traffic Safety Administration (NHTSA) promulgated a rule requiring that certain percentages of newly manufactured cars have airbags or automatic seatbelts. 463 U.S. at 36–37. Four years later, when it became clear that almost all cars would have automatic seatbelts, which had diminished safety benefits because they could be easily detached, NHTSA rescinded the rule because it believed it would no longer increase the effective use of restraints. *Id.* at 38–39. According to the Supreme Court, that

20

decision was arbitrary and capricious because NHSTA did not consider the life-saving effects of airbags, *id.* at 47–49, and because it did not adequately explain why it believed automatic detachable seatbelts would not be safer than existing manual seatbelts, *id.* at 51–57. *State Farm* holds that agency action must be based on some "reasoned analysis," which NHTSA did not provide, and that action based on a nonrational decisionmaking process is arbitrary and capricious. *Id.* at 57.

But as we have explained, the arbitrary-and-capricious standard is at its least demanding when we are evaluating an agency's decision not to engage in rulemaking. Our review of the agency's conclusion in that case is highly deferential, and we will rarely second-guess it if the agency provides us sufficient reasoning to understand how it reached that conclusion.[4] If NHTSA had denied a petition for rulemaking in *State Farm*, rather than rescinded a final rule, then it is likely its decision would have cleared the arbitrary-and-capricious standard. With the standard in mind, we turn to Coinbase's argument that the principle underlying *State Farm* compels notice-and-comment rulemaking here.

If Coinbase means to argue that the SEC's explanation for its decision was arbitrary and capricious because it failed adequately to consider the issues raised in Coinbase's petition, then this argument goes to the substantive rationality of its decision, not whether there is some general presumption in favor of rulemaking. But that does not seem to be Coinbase's point—at least not at this stage of its argument. Instead, it apparently means to argue that the SEC categorically cannot consider

---

[4]   As we explain below, the SEC has not provided us with sufficient reasoning here. *See infra* at Section III.C.

21

important aspects of a problem when regulating through adjudication because enforcement actions lack the information-gathering benefits of notice-and-comment rulemaking. We disagree. The Supreme Court held expressly in *National Labor Relations Board v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974), that although "rulemaking would provide the [agency] with a forum for soliciting the informed views of those affected … before embarking on a new course," "surely the [agency] has discretion to decide that the adjudicative procedures … may also produce the relevant information necessary to mature and fair consideration of the issues."

Coinbase seizes on language from our decision in *Federal Labor Relations Authority v. Department of Navy* that "'notice and comment rulemaking' is 'particularly appropriate' because it is 'advisable' for an agency to solicit and learn from the insights of affected parties." Pet. Br. 32 (quoting 966 F.2d 747, 763 n.15 (3d Cir. 1992) (en banc)). Coinbase distorts that decision. We held that an interpretive rule from the Office of Personnel Management (OPM) was unenforceable because it was disseminated only in an amicus brief and an unpublished letter, making it "extremely difficult if not impossible" for an outside party to learn of it. *Dep't of Navy*, 966 F.2d at 764. We did "note," in dicta, that OPM should have considered formalizing its purported interpretive rule through notice-and-comment rulemaking. *Id.* at 763 n.15. But we did not say, or even suggest, that OPM could only consider all aspects of the problem through notice-and-comment rulemaking. Indeed, our decision did not rest on either OPM's decision to forgo notice-and-comment rulemaking or any purported failure to consider all aspects of a problem.

22

### iii.    Fair Notice and Due Process

The final principle Coinbase highlights is fair notice. It contends that the SEC's decision not to promulgate comprehensive rules governing digital assets deprives it and other digital-asset firms of fair notice. *FCC v. Fox Television Stations Inc.*, 567 U.S. 239, 253–54 (2012) (ruling that the Due Process Clause requires that agencies bringing an enforcement action "provide" through written guidance, regulations, or other activity "a person of ordinary intelligence fair notice" that the regulated conduct was "prohibited"). Those fair-notice concerns are heightened here because Coinbase believes that the SEC and its officials, by purportedly changing their position on whether existing securities laws cover digital assets, have led it down the garden path.

The SEC responds that it has provided fair notice of its view that digital assets may qualify as securities as far back as the DAO Report in 2017. And even if it had not, "fair notice is a defense that defendants may attempt to assert to enforcement in certain circumstances," "not a basis for mandating rulemaking." Resp. Br. 40.

Assuming for argument's sake that the SEC has tried to make major regulatory changes in some or all of its enforcement actions, the appropriate way for Coinbase to raise a fair-notice argument would be as a defense in those enforcement actions, not on appeal from a petition to begin broad and open-ended rulemaking. That is because whether an enforcement action violates a regulated entity's due-process rights depends on the nature of the specific enforcement action. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015) ("[a] different set of [due-process] considerations is implicated when agencies are involved in statutory or regulatory interpretation" and "'[l]esser degrees of specificity' are allowed in civil

cases because the consequences are smaller than in the criminal context" (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992))).

Coinbase insists that fair-notice problems are "heightened" here because the SEC "itself has experienced 'considerable difficulty' interpreting a statute that it administers and its actions [have] produce[d] 'considerable uncertainty.'" Pet. Br. 33 (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995) and *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017)). And those fair-notice problems are heightened further still by the "'new liability' that the SEC is attempting to impose on the digital asset industry 'for past actions which were taken in good-faith reliance on [the SEC's] pronouncements ….'" *Id.* (quoting *Bell Aerospace*, 416 U.S. at 295).

Again, this procedural posture does not afford the parties an adequate opportunity to air this issue, or for us to consider it properly, because the objection is abstract and not grounded in challenges to any particular enforcement actions. But even if an appeal from an order denying a petition to initiate rulemaking were an appropriate vehicle for raising fair-notice objections, this one fails.

Coinbase repeatedly insists that the SEC has changed its position on whether the securities laws apply to digital assets. As proof, Coinbase points to comments from agency staff and individual Commissioners to the press and Congress. But individual Commissioners and staff members do not speak for the SEC, and their statements do not necessarily reflect the agency's official position. Indeed, Coinbase has recognized as much. *See, e.g.*, Coinbase Global, Inc., Form S-1 Registration Statement, at 29 (Feb. 25, 2021) (explaining that "such statements are not official policy statements by the SEC and reflect

only the speakers' views, which are not binding on the SEC or any other agency or court"); *see also SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 192 (S.D.N.Y. 2023) (digital-asset defendants' "attempt to manufacture a 'fair notice' problem here comes down to asserting the SEC's position in this litigation is inconsistent with a position that the SEC never adopted").

The SEC directs our attention instead to an early, and official, articulation of its position: the DAO Report in 2017, explaining that a digital asset qualifies as a security if it satisfies the criteria for an investment contract laid out in *Howey*. DAO Report at *8 (quoting *Howey*, 328 U.S. at 299). The SEC expressly warned "that the U.S. federal securities law may apply to various activities, *including distributed ledger technology*, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale," *id.* at *7 (emphasis added), and "advise[d] those who would use … *distributed ledger or blockchain-enabled means* for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," *id.* at *1 (emphasis added).

Coinbase responds that the SEC's position—"whether a crypto asset implicates the federal securities laws depends on the facts and circumstances of its offer and sale"—is a "truism" and thus "no test at all." Reply Br. 8 (quoting Resp. Br. 26). In Coinbase's view, the relevant question for purposes of fair notice is not "*whether* the securities laws can apply to certain digital asset transactions, but rather *how and to what extent* they apply." *Id.* (emphasis in original). But an agency need not exhaustively catalog in a rule how a statute or regulation will apply in every circumstance. *See Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R.*

25

*Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021) ("Agencies do not ordinarily have to regulate a particular area all at once."). If that were true, then rulemaking by adjudication would be infeasible. And although the SEC's application of the *Howey* test to a particular digital asset may sufficiently depart from its past conduct to raise fair-notice concerns, its general position that some digital assets may qualify as securities does not. The former class of challenges will turn on case-dependent factors like what kind of digital asset is at issue, whether the SEC is enforcing a statute or a regulation, and how far its interpretation of the statute or regulation deviates from its prior positions—factors properly raised in individual enforcement actions.

\*     \*     \*

Coinbase argues that the SEC acted arbitrarily and capriciously by bringing enforcement actions that seek to apply the securities laws to digital assets without engaging in rulemaking. This argument fails for a fundamental reason: Coinbase repeatedly confuses grounds for setting aside an agency's rule with grounds for mandating rulemaking. None of the principles it invokes supports its argument that the SEC acted arbitrarily and capriciously by failing to engage in notice-and-comment rulemaking, and none supports its request that we compel the SEC to institute rulemaking proceedings now. If a particular enforcement action violated any of the administrative-law precepts Coinbase offers, then the proper recourse would be to move to dismiss that action or to vacate or remand the resulting order, *not* to mandate rulemaking.

2.     Adjudication Versus Notice-and-Comment Rulemaking

Rulemaking on digital assets through enforcement actions does not categorically violate any of the administrative-

26

law principles Coinbase has identified as forming its presumption in favor of notice-and-comment rulemaking. And, as noted, if any particular adjudication does, Coinbase can raise those fact-dependent objections as a defense in those enforcement actions. So why does this not end the analysis? Although "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency," *Chenery II*, 332 U.S. at 203, "there may be situations where the [agency]'s reliance on adjudication would amount to an abuse of discretion," *Bell Aerospace*, 416 U.S. at 294. Coinbase argues that this is one of those situations.

According to Coinbase, "the 'function of filling in the interstices of [statutes] should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules to be applied in the future.'" Reply Br. 5 (quoting *Chenery II*, 332 U.S. at 202). It argues that regulating through adjudication is appropriate only when the agency "'could not reasonably foresee' the problem," "lacks 'sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule,'" or confronts a problem "so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." Pet. Br. 36 (quoting *Chenery II*, 332 U.S. at 202–03). And even though "agencies sometimes have discretion to make policy through adjudication rather than rulemaking," Coinbase argues "that leeway is irrelevant here" because "the SEC has already formed a new and sweeping (if indeterminate) view of the securities laws' applicability to digital assets that it is asking federal courts to enforce with penalties." *Id.* at 35–36.

This argument relies on *Chenery II* to carry a load it cannot bear. *Chenery II* does not, as Coinbase claims, restrict

27

rulemaking by adjudication to those situations in which "'specialized problems' arise that are ill-suited to the rulemaking process." *Id.* at 36 (quoting *Chenery II*, 332 U.S. at 202). To the contrary, the Supreme Court clarified that requiring an agency to choose notice-and-comment rulemaking over rulemaking by adjudication "would be to stultify the administrative process," *Chenery II*, 332 U.S. at 202, and that "[t]he scope of [a court's] review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action," *id.* at 207. "[A]n administrative agency must be equipped to act either by general rule or by individual order," and "[t]o insist upon one form of action to the exclusion of the other is to exalt form over necessity." *Id.* at 202.

The Supreme Court has since reaffirmed that "[t]he views expressed in *Chenery II* … make plain that [an agency] is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [agency]'s discretion." *Bell Aerospace*, 416 U.S. at 294. We have cited this line of cases ourselves for the proposition that "[a]n agency's 'judgment that adjudication best serves [its] purpose is entitled to great weight.'" *Wyndham*, 799 F.3d at 254 n.19 (quoting *Bell Aerospace*, 416 U.S. at 294).

Coinbase's argument also cannot account for the longstanding practices of certain agencies. For example, the National Labor Relations Board "has chosen to promulgate virtually all the legal rules in its field through adjudication rather than [through] rulemaking." *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 445 n.13 (3d Cir. 2016) (brackets in original). It is hard to reconcile Coinbase's narrow view of rulemaking by adjudication with actual agency practice.

To be sure, the APA constrains an agency's choice between rulemaking and adjudication—"courts have sometimes found the choice of adjudication inappropriate [when] an agency purports to establish a new rule of widespread application." *Nestle Dreyer's Ice Cream Co. v. NLRB*, 821 F.3d 489, 501 (4th Cir. 2016). But Coinbase warps this principle, which provides only that an agency cannot use adjudication to promulgate and retroactively enforce rules that depart significantly from past agency practice. When an agency does so, a regulated entity can challenge the new rule defensively and have it set aside. It does not follow, however, that the agency may *also* be compelled to begin notice-and-comment rulemaking. Whether a particular enforcement action announces a new rule of widespread application or merely applies an existing rule to new facts depends on both the rule the SEC invokes and the fact pattern to which it means to apply that rule. And the appropriate redress would not be to mandate that the agency start rulemaking—it would be to dismiss the action or to vacate or remand the agency's order.

Coinbase cites no cases in which a court has determined that an agency improperly promulgated new law through adjudication *and* ordered the agency to engage in rulemaking. Its cited cases follow a more familiar path: A defendant in an enforcement action appeals from an adverse determination and the reviewing court sets aside the agency's order for improperly applying new rules of widespread application retroactively. For example, in *Ford Motor Co. v. Federal Trade Commission*, 673 F.2d 1008, 1010 (9th Cir. 1981), the Ninth Circuit held that the FTC's effort to reinterpret its regulations to apply to conduct that had never been held unlawful before was improper because the adjudication "change[d] existing law, and ha[d] widespread application." But the Ninth Circuit did not mandate rulemaking—it merely vacated the FTC's order. *Id.*

29

But even if we accept Coinbase's premises—that rule-making by adjudication is limited to the special circumstances it enumerates in its briefs and that it may appropriately challenge the validity of individual enforcement actions elsewhere in an appeal from a denial of a rulemaking petition—it still would not be clear that the SEC abused its discretion by choosing to regulate partially through adjudication. Coinbase concedes, for instance, that one "specialized problem" that justifies rulemaking by adjudication is "when the agency lacks 'sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule.'" Pet. Br. 36 (quoting *Chenery II*, 332 U.S. at 202–03). In Coinbase's view, the SEC cannot justify rulemaking by adjudication on that ground because it has already "formed a new and sweeping (if indeterminate) view of the securities laws' applicability to digital assets that it is asking federal courts to enforce with penalties." *Id.* at 35–36. But this argument confuses different issues. By bringing an enforcement action, the SEC must conclude that existing law supports its position with respect to *that action.* It does not follow, however, that the SEC has further concluded that it does not need more information to formulate additional rules or policies about digital assets. If the agency determines that a particular digital asset qualifies as a security and brings an enforcement action based on that conclusion, it may still use the information and experience it develops in that action to shape its general policymaking on digital assets going forward.[5]

---

[5] The SEC has explained in both its order and its brief that it has not settled exclusively on enforcement actions and that

30

We are not persuaded that the SEC categorically lacks discretion to regulate digital assets through adjudication or individualized enforcement actions. And whether it has abused its discretion by proposing new and retroactive rules of widespread application in any particular enforcement action is not properly before us.

### B. Was There a Fundamental Change in a Significant Factual Predicate Underlying Existing Securities Regulations?

A reviewing court may overturn an administrative agency's decision not to initiate rulemaking if there is "compelling cause, such as … a fundamental change in the factual premises previously considered by the agency." *Flyers Rts.*, 864 F.3d at 743 (internal quotation marks and citation omitted);

---

it may engage in notice-and-comment rulemaking as it accumulates more experience. App. 6 ("Any consideration of whether and, if so, how to alter the existing regulatory regime may be informed by, among other things, data and information provided by numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing."); Resp. Br. 41 ("[T]he Commission's denial of Coinbase's rulemaking petition was not a decision to address crypto asset securities exclusively through adjudication instead of rulemaking; no such choice was presented or made. Indeed, far from choosing to proceed solely by enforcement, the Commission explained that several ongoing rulemakings directly or indirectly relate to crypto asset securities and that their results may inform its future regulatory undertakings." (brackets and internal quotation marks omitted)).

*see also EMR Network v. FCC*, 391 F.3d 269, 273–74 (D.C. Cir. 2004) (noting that one of the "strongest potential bases for overturning an agency's refusal to initiate rulemaking" is "that a significant factual predicate of a prior decision on the subject has been removed" (internal quotation marks and ellipses omitted)). A "refusal to initiate a rulemaking naturally sets off a special alert when a petition has sought modification of a rule on the basis of a radical change in its factual premises." *Am. Horse*, 812 F.2d at 5.

Coinbase contends there has been just that kind of radical change here. In its view, "[a] key premise of the SEC's existing regulations is that compliance is possible for the firms that the SEC seeks to subject to those rules. But the emergence of digital assets and the SEC's claim that many or all are securities have deeply undermined that premise." Pet. Br. 40. Coinbase argues that digital assets are largely incompatible with existing securities regulations for several reasons, including the following:

- Digital assets, unlike securities, can be "used" for "paying transaction, or 'gas' fees," "as a medium of exchange for native applications," and for "helping secure a network." *Id.* at 41 (quoting App. 18). Registering digital assets would make these uses "impossible" because "all transactions would have to occur within a broker-dealer and registered-exchange framework." *Id.*

- Existing securities regulations require disclosures about "the operation of the issuer, its financial statements, its leadership, what risks it may face, and information about various other parts of the business." *Id.* (quoting App. 22). But many digital assets are "created or managed by a diffuse group of individuals, who are not a

32

central 'team,' and 'may not even know each other's true identities.'" *Id.* (quoting App. 23–24).

- The information required by existing disclosure regulations is largely unhelpful to "digital asset user[s]," who are "far more likely to care about the details of the asset's underlying protocol." *Id.* at 42 (citing App. 49).

- Requiring digital asset platforms to register as exchanges would limit them "to offering *only* registered securities," even though "the vast majority of digital assets are commodities, not securities." *Id.* at 43–44 (citing App. 28) (emphasis in original).

The SEC responds that "the purported 'changed circumstances' to which Coinbase points—that some market participants may find compliance with longstanding requirements of the federal securities laws 'not possible or not economically viable'—differs in kind from the type of change referred to in the caselaw Coinbase cites." Resp. Br. 33. The SEC asserts that a "significant factual predicate of a prior decision *on the subject*" must change, and that because Coinbase does not base its arguments on any particular prior agency decisions, it has identified no changes in factual predicates. *Id.* at 34 (emphasis in original).

Coinbase's workability concerns are not fundamental changes in the factual predicates underlying the existing securities-law framework. The cases it cites trace the following pattern: a federal agency adopts or declines to adopt a regulation at Time 1 and expressly rests its decision in part on certain evidence or reasons; the agency is petitioned at Time 2 to modify or repeal its rules in light of intervening developments that contradict the basis for the agency's initial decision; and the

33

agency declines, with minimal explanation or in reliance on its earlier justification, to reconsider its prior decision.

For example, in *Geller v. Federal Communications Commission*, 610 F.2d 973, 979 (D.C. Cir. 1979)*,* the FCC adopted a set of cable-television rules solely as part of a compromise agreement to facilitate the passage of certain copyright legislation. Four years later, Congress had adopted, and the President had enacted, that legislation. At that point, the petitioner asked the FCC to reexamine the rules it had earlier adopted because "the Commission can no longer validly adhere to provisions that do not, in its judgment, best serve the public interest in view of the undisputed fact that the [compromise] agreement is now a dead letter." *Id.* at 976 (internal quotation marks omitted). Even though the basis for the regulations had changed when the copyright legislation was enacted, the agency refused either to terminate the regulations or to show how they continued to have a basis in law. *Id.* at 979–80. The D.C. Circuit thus ordered the FCC to provide a new explanation for its decision to retain the regulations. *Id.* at 980–81.

Similarly, in *American Horse*, 812 F.2d at 1–2, the Department of Agriculture had adopted a regulation to implement a statutory prohibition on "soring" horses, which involved fastening heavy chains to a horse's front limbs to encourage it to adopt a desired gait. In its initial rulemaking, the Department "made quite clear its recognition that the premises for not enacting broader specific prohibitions might erode," and explained that "it relied on evidence from three test clinics which appeared to exonerate action devices weighing less than those that it proposed to forbid." *Id.* at 2. "At the same time it also mentioned that it had recently commissioned a study of soring methods and techniques at a major university that might eventually result in further changes in the regulations." *Id.* (internal

quotation marks omitted). The study eventually suggested that certain methods not expressly prohibited by the Department may have fallen within the statutory definition of soring. *Id.* at 2–3. The petitioner requested rulemaking and noted that the study "presented new facts that merited a new rulemaking." *Id.* at 5. The Department denied the petition and noted only that it had "reviewed studies and other materials," and "[o]n the basis of this information, … believe[d] that the most effective method of enforcing the Act [wa]s to continue the current regulations." *Id.* The D.C. Circuit held that the Department's decision was not adequately reasoned and that "the finding of the [intervening] study may or may not remove a 'significant factual predicate' of the original rules' gaps."[6] *Id.* at 7. The court ordered the Secretary to "explain his decision or to institute a new rulemaking proceeding on action devices and other soring practices." *Id.* at 7–8.

Coinbase here insists that "[a] key premise of the SEC's existing regulations"—it does not specify which—"is that compliance is possible for the firms that the SEC seeks to

---

[6] The court also held that the Secretary's decision involved "plain errors of law" because his reasoning indicated that the Department misunderstood the authorizing statute, which was "clearly designed to end soring." *Am. Horse,* 812 F.2d at 5, 6 (internal quotation marks omitted). Besides failing to "present[] a reasonable explanation of his failure to grant the rulemaking petition … , particularly in light of the apparent message of the [intervening] study," the Secretary's conduct "strongly suggest[ed] that he ha[d] been blind to the nature of his mandate from Congress." *Id.* at 7. That is not the case here.

35

subject to those rules." Pet. Br. 40. But it does not support that claim. It simply asserts that the alternative—that the SEC "has no duty to make compliance with its rules possible"—is "astounding." Reply Br. 2. That is not, however, what the SEC said. It has reasonably explained that the existing securities-law framework is not predicated on the assumption that it will never burden any potential new market participants. To the contrary, law often works by regulating or even prohibiting conduct that some would like to pursue. In the securities-law context, it is unremarkable that novel complex financial instruments may not always fit neatly within existing securities rules, especially if inherent attributes of those novel financial instruments may undermine the objectives of those rules.[7]

---

[7] Coinbase draws on the D.C. Circuit's decision in *Alliance for Cannabis Therapeutics v. Drug Enforcement Agency* for the proposition that "[i]mpossible requirements imposed by an agency are perforce unreasonable." Reply Br. 12 (quoting 930 F.2d 936, 940 (D.C. Cir. 1991)). But our case is easily distinguishable from *Cannabis Therapeutics*. The regulated entities there sought to reclassify marijuana as a Schedule II drug, and to do so they had to show that it "enjoy[ed] general 'availability' or 'use.'" *Cannabis Therapeutics*, 930 F.2d at 940. But the agency's designation of marijuana as a Schedule I drug made that showing definitionally impossible. The core conundrum in *Cannabis Therapeutics* was that the regulated entity was subject to "intractably contradictory agency directives" that "created a seemingly permanent Catch-22," *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 412 (D.C. Cir. 2020) (citing *Cannabis*

36

The more fundamental problem with Coinbase's argument, however, is that it miscomprehends the doctrine it invokes. The changed-factual-predicate principle applies only in the narrow set of cases in which an agency explicitly justifies its action on a fact that subsequently changes. The logic underlying this principle is that the agency's action is no longer reasoned when its stated justification no longer holds. But unlike the petitioners in *Geller* and *American Horse*, Coinbase does not point to specific SEC actions, let alone any of its stated justifications. Instead, it points to the entire securities-law edifice and insists that it rests on an unstated assumption about ease of compliance. If this were sufficient, then "overturn[ing] an agency judgment not to institute rulemaking" would no longer be limited only to "the rarest and most compelling of circumstances." *WWHT*, 656 F.2d at 818.

To be sure, Coinbase's workability concerns are not frivolous. *See infra* at 39–43. But it confuses the analysis by arguing that ease of compliance is a factual predicate underlying existing securities regulations rather than merely a relevant and significant consideration of its petition.

## C.    Was the SEC's Explanation Sufficiently Reasoned?

The SEC is not compelled by the APA or other administrative-law principles to start notice-and-comment rulemaking here. Whether it does so is a matter of discretion to which

---

*Therapeutics*, 930 F.2d at 940)—not merely that the agency adopted regulations that prohibited or regulated some conduct that the regulated entity wanted to pursue.

we afford great deference. But has the SEC provided us with a sufficiently reasoned explanation to which we can defer?

An agency's decision to deny a petition for rulemaking "must be 'reasoned' if it is to survive arbitrary and capricious review." *Env't Health Tr.*, 9 F.4th at 903 (quoting *Am. Horse*, 812 F.2d at 5). The agency must provide us with "assurance that [it] considered the relevant factors" as well as "a discernable path to which [we] may defer." *Am. Radio*, 524 F.3d at 241.

The SEC provided three reasons in its order for denying Coinbase's rulemaking petition. First, it "disagree[d] with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable." App. 6. Second, it claimed that its "consideration of whether and, if so, how to alter the existing regulatory regime may be informed by, among other things, data and information provided by numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing." App. 6. It listed several of these undertakings in a footnote. App. 6 n.3. And third, it noted that it is "engaged in many undertakings that relate to regulatory priorities extending well beyond crypto asset securities," and believes "[t]he requested regulatory action would significantly constrain the Commission's choices regarding competing priorities." App. 6.

Coinbase argues that the SEC's order was insufficiently reasoned. For the reasons below, we agree.

1.      Workability

Coinbase characterizes the SEC's response to its workability concerns as "ipse dixit" (that is, mere assertion without

38

proof) and "conclusory." Pet. Br. 47. Coinbase claims it is not enough that the SEC says it disagrees; it must explain "*why* it disagrees." *Id.* at 48 (emphasis in original). The SEC responds by noting that 5 U.S.C. § 555(e) requires only a "brief statement" that "need not be exhaustive." Resp. Br. 42 (quoting *Flyers Rts. Educ. Fund v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1363 (D.C. Cir. 2020)). In its view, "[n]o additional explication is required to understand the Commission's policy decision not to replace the entire existing regulatory framework that has governed the multi-trillion dollar securities markets for decades simply to make compliance easier for a small set of market participants offering a purportedly new asset." *Id.* at 22.

The SEC also argues that ongoing enforcement actions show that applying the existing securities-law framework to digital assets is workable. According to the agency, "[f]or years, federal courts have applied Congress's definitions and the Supreme Court's precedents to the particular facts and circumstances of crypto asset security offers, sales, and transactions in Commission enforcement actions, with no court concluding that the current regulatory framework is unworkable for issuers of crypto asset securities or intermediaries in the trading, settlement, and custody of such securities." *Id.* at 23–24.

Coinbase is right that the SEC's explanation is insufficiently reasoned. "[W]hen an agency denies a petition for rulemaking, the record can be slim, but it cannot be vacuous." *Flyers Rts.*, 864 F.3d at 747. That is "[e]specially so when, as here, the petition identifies an important issue that falls smack-dab within the agency's regulatory ambit." *Id.* "Rather, the agency must provide 'assurance that it considered the relevant factors,' and it must provide analysis that follows 'a discernable path to which the court may defer.'" *Env't Health Tr.*, 9 F.4th at 903

39

(quoting *Am. Radio*, 524 F.3d at 241) (brackets omitted). A single sentence disagreeing with the main concerns of a rulemaking petition is conclusory and does not provide us with any assurance that the SEC considered Coinbase's workability objections, nor does it explain how it accounted for them.

*Environmental Health Trust* is instructive. In that case, the petitioners challenged the FCC's decision to terminate its notice of inquiry about whether to modify its guidelines for exposure to radiofrequency radiation. The petitioners pointed to "multiple studies and reports" "purporting to show that RF radiation at levels below the Commission's current limits cause negative health effects." *Env't Health Tr.*, 9 F.4th at 903. The FCC responded by stating that "the FDA has reviewed, and will continue to review, many sources of scientific and medical evidence," and that "[b]ased on our ongoing evaluation of the issue, the totality of the available scientific evidence continues to not support adverse health effects in humans caused by exposures at or under the current radiofrequency energy exposure limits." *Id.* at 904. This explanation was not sufficiently reasoned considering the studies and comments provided by the petitioners because the FCC did "not explain why the FDA determined, despite the studies and comments that Petitioners cite[d], that exposure to RF radiation at levels below the Commission's current limits does not cause harmful health effects." *Id.* at 905. The FCC's explanation was "conclusory," and "conclusory statements 'cannot substitute for a reasoned explanation.'" *Id.* (quoting *Am. Radio*, 524 F.3d at 241).

The SEC argues that *Environmental Health Trust* is distinguishable. In that case, "the agency's explanation was found inadequate because it failed to assess the implications of new scientific evidence," whereas Coinbase's "petition identified no new evidence requiring such an assessment." Resp. Br. 25.

40

It is unclear why this distinction matters. The SEC's minimum obligation is to "clearly indicate that it has considered the potential problem identified in the petition and provide a 'reasonable explanation as to why it cannot or will not exercise its discretion' to initiate rulemaking." *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007)). Whether the problem identified involves new scientific evidence does not have any bearing on whether the agency must explain its reasoning.

Although *Environmental Health Trust* involved evidence that exposed changed factual circumstances while this case does not, the point is that when an agency is prompted to explain itself—either because of a changed factual predicate or simply because a petition for rulemaking raises a relevant and significant argument—it must provide "assurance that [it] considered the relevant factors," *Am. Radio*, 524 F.3d at 241, and "sufficiently explain[] its reasoning," *id.* at 245 (Kavanaugh, J., concurring in part and dissenting in part); *see also Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998) ("An agency must … demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant."). The SEC's response to Coinbase's workability concerns—which are relevant and significant—is "of the conclusory variety that [courts] have previously rejected as insufficient to sustain an agency's refusal to initiate a rulemaking." *Env't Health Tr.*, 9 F.4th at 904–05. It has said that it believes the existing securities-law framework is not unworkable for digital assets, but we have no basis in the record for determining *why* it believes that or how it arrived at that conclusion. This explanation is not "slim"—it is "vacuous." *Flyers Rts.*, 864 F.3d at 747.

41

The SEC insists before us that Coinbase's workability concerns are unfounded because it has pursued successful civil and criminal enforcement actions against digital-asset firms. Resp. Br. 23–24. But it did not identify this reason in its order. When "assessing the reasonableness of [an agency's action,] we look only to what the agency said at the time of the [action]—not to its lawyers' post-hoc rationalizations." *Good Fortune Shipping SA v. Comm'nr of IRS*, 897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotation marks and citation omitted); *see also SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). "We are bound on review to the record that was before the agency at the time it made its decision." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008). That record includes "the petition for rulemaking, comments pro and con where deemed appropriate, and the agency's explanation of its decision to reject the petition." *WWHT*, 656 F.2d at 817–18.

The record here says nothing to suggest that successful enforcement actions factored into the agency's workability conclusion. The SEC cannot retroactively build the record by providing a conclusory justification at a high level of generality in the order itself and then divulging its concrete reasons only after its order has been challenged. Nor can we fill the gap in the record by drawing our own inferences about how we think the SEC reached its conclusion. *See Env't Health Tr.*, 9 F.4th at 914 ("But we cannot supply reasoning in the agency's stead, and here the Commission has failed to provide any reasoning to which we may defer." (internal citation omitted)); *Am. Radio*, 524 F.3d at 241 ("[S]o conclusory a statement cannot substitute for a reasoned explanation," and we "cannot fill the void." (internal citations omitted)).

## 2. Resource Allocation

Coinbase next challenges the SEC's explanation that it has other regulatory priorities. According to Coinbase, the SEC's own conduct shows that digital assets are a regulatory priority, and that its order did not adequately identify any specific competing priorities, "let alone priorities of a higher order." Pet. Br. 54. This argument comprises two sub-arguments—one is compelling, the other is not.

The uncompelling argument first. Coinbase's contention that "the digital asset industry *is* a priority for the SEC," *id.* (emphasis in original), is not responsive to the latter's position that it has wide discretion to select its regulatory priorities and allocate resources accordingly. Even if the SEC had made digital assets a priority, it may choose how to order those priorities. That an issue is a priority "does not compel [an agency] to promulgate a rule." *Int'l Union*, 361 F.3d at 256.

Coinbase's second argument is that the SEC's order does not adequately explain which other regulatory efforts it is prioritizing or why—it merely cites to *all* its ongoing rulemakings. Coinbase is correct that citing all ongoing rulemakings is insufficient. An agency's "resource-allocation judgments … fall squarely within the agency's" discretion. *Flyers Rts.*, 864 F.3d at 749. But, as always, the agency must at least explain its decision. For example, in *International Union*, 361 F.3d at 251–52, the petitioners requested that OSHA regulate metalworking fluids. The agency declined the petition on the ground that regulating metalworking fluids would require an "enormous allocation" of agency resources, and that it had other regulatory priorities. *Id.* at 255 (internal quotation marks omitted). Critically, OSHA "weighed the scientific evidence of health hazards posed by exposure to [metalworking fluids] against its other regulatory priorities" and "named three

43

priorities more pressing." *Id.* It explained that these priorities each addressed more dangerous toxic substances. *Id.* OSHA did not merely assert that it had other priorities—it identified its other priorities and explained why it believed they were more pressing than regulating metalworking fluids.

When an agency explains its allocation of resources and ordering of regulatory priorities, courts ordinarily should not disturb that decision because the agency is in "a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). But resource allocation is not a talisman that an agency may invoke to escape judicial review. It is one explanation for agency inaction among many. It is an explanation entitled to a high level of deference, to be sure, but like any other explanation for agency action, it must be sufficiently reasoned. If it were sufficient for an agency to assert that it has other priorities and then point generally, without further explanation, to all of its ongoing rulemakings, then this "broad discretion" would become a "blanket exception to APA review in any matter involving the allocation of agency resources." *Compassion Over Killing*, 849 F.3d at 857; *see also WWHT*, 656 F.2d at 814 ("[W]e reject the suggestion that agency denials of requests for rulemaking are exempt from judicial review.").

The SEC's explanation that it has other regulatory priorities may be a sufficient basis for denying a rulemaking petition, *see Int'l Union*, 361 F.3d at 255–56, but it must do more than claim it has other priorities and point to "the 43 rules identified on the fall 2023 agency rule list," Resp. Br. 19. At a minimum, it must explain why it is prioritizing other regulatory actions.

44

### 3. Incremental Action

Finally, Coinbase asserts that the SEC's decision to proceed incrementally is a smokescreen because the digital-asset rules currently in development do not get at the heart of its request—global clarity on how digital-asset firms "could comply with [existing federal securities regulations], and why the law requires them to do so." Pet. Br. 52. The SEC responds that this argument "misses the point" because it never "claim[ed] that those undertakings were entirely coextensive with Coinbase's requested rulemaking." Resp. Br. 13. "Rather, … those undertakings may provide information and data that could inform its consideration of future regulatory action." *Id.* at 14.

The SEC is right that it may justify its decision to hold off on more extensive rulemaking on the ground that it would prefer first to accumulate experience and information. After all, "agencies have great discretion to treat a problem partially" and "regulat[e] in a piecemeal fashion." *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 409–10 (D.C. Cir. 2013) (quoting *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir. 1989)); *see also Massachusetts*, 549 U.S. at 524 (recognizing that "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop"). That Coinbase disagrees with the proposed incremental rules or finds them insufficient says nothing about the adequacy of the SEC's explanation that it needs additional information and experience before initiating more expansive rulemaking.

Although the SEC is correct as a general matter that it may justifiably decide to proceed by incremental rulemaking or adjudication before undertaking more comprehensive action, it still must explain its decision in a way that allows us to understand, and thus defer to, its reasoning. The explanation provided by the SEC in its order, however, is conclusory. It

states, in full, that "[a]ny consideration of whether and, if so, how to alter the existing regulatory regime may be informed by, among other things, data and information provided by numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing." App. 6. These are many words that mean very little—the SEC might take future action on digital assets, and if it does, it might consider experience it accumulates from other agency actions that might deal directly with digital assets. This is not a sufficiently reasoned explanation because it does not allow us to understand *why* it prefers to proceed by incremental action, particularly considering the significant workability concerns identified by Coinbase in its petition.

*     *     *

Any of the three grounds to which the SEC gestures in its order—that it disagrees with the workability concerns outlined in the rulemaking petition; that it has other priorities; or that it would prefer to proceed incrementally—could be sound and independently sufficient bases for denying a rulemaking petition. But the SEC must provide more than these conclusory statements; it must explain its reasoning so that we can assure ourselves that its decision considered all important aspects presented by the petition and resulted from reasoned decisionmaking.[8] Because the record before us, however, does not provide

---

[8] The SEC does not need to show, as Coinbase insists, that digital-asset firms can seamlessly comply with existing rules. *See* Oral Arg. Tr. 8:5–10 ("I think that [the SEC] would need to address the different points regarding

46

that kind of reasoned explanation, we conclude that the SEC's order is arbitrary and capricious.

## IV. WHAT IS THE APPROPRIATE REMEDY?

Having found the SEC's order insufficiently reasoned, we next consider the appropriate remedy. Coinbase asks that we order the SEC "to proceed directly to rulemaking" rather than remand for further explanation because it has "had more than enough opportunity to answer Coinbase's workability concerns." Oral Arg. Tr. 10:13–16. That we will not do.

If we "simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Recall that "[i]t is only in the rarest and most compelling of circumstances that" courts have "acted to overturn an agency judgment not to institute rulemaking." *WWHT*, 656 F.2d at 818. Coinbase insists that this case is one of those circumstances because the SEC is motivated by "entrenched hostility towards the digital asset industry," Reply Br. 25, and has "proven in this litigation and

---

workability that we set out. We set out a number of different problems in our petition, … [and] it would be arbitrary and capricious if they did not respond to each of them."). It would likely be enough to provide a well-reasoned explanation for why it believes Coinbase's workability concerns, regardless of their merit, do not justify rulemaking—for example, if the SEC were to provide a reasoned explanation why it needs more information or has higher priorities.

elsewhere that it will not take action unless compelled by a court," Pet. Br. 49.

We are not persuaded that this is the rare case that warrants the extraordinary remedy Coinbase seeks. Our decision in *Public Citizen Health Research Group v. Chao*, 314 F.3d 143 (3d Cir. 2002), illustrates the kind of extreme situation that may justify ordering an agency to institute rulemaking. In 1993, OSHA began rulemaking to lower the permissible exposure limit for hexavalent chromium, a dangerous carcinogen.[9] *Id.* at 145. By 2002—almost ten years later—OSHA still had not promulgated a rule, and indeed said that it "might not promulgate a rule for another ten or twenty years, if at all." *Id.* We held, given the extreme delay and the "human lives … at stake,"[10] *id.* at 148, that "OSHA's delay … [had] exceeded the bounds of reasonableness" and ordered "OSHA to proceed expeditiously with its … rulemaking," *id.* at 159. In *International Union*, we emphasized that "the human lives at stake played a critical role in *Public Citizen*." 361 F.3d at 255 n.1 (cleaned up).

An extreme delay that endangers human lives is our paradigm case for ordering agency rulemaking. By contrast, when,

---

[9]  Hexavalent chromium was one of the "three priorities more pressing than [metalworking fluids]" later identified by OSHA in *International Union*, 361 F.3d at 255.

[10]  OSHA's risk assessment of hexavalent chromium had concluded that exposure "over a 45-year working lifetime could be expected to result in between 88 and 342 excess cancer deaths per thousand workers." *Public Citizen*, 314 F.3d at 147.

48

as here, "the interests at stake are primarily economic[,] [s]uch interests, without more, do not present the unusual or compelling circumstances that are required in order to justify a judgment by [a] court overturning a decision of [an agency] not to proceed with rulemaking." *Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*, 883 F.2d 93, 97 (D.C. Cir. 1989) (cleaned up).[11]

## V.    CONCLUSION

The SEC was not presumptively required to engage in notice-and-comment rulemaking for digital assets. Nor has Coinbase identified a fundamental change in a significant factual predicate underlying existing securities regulations sufficient to require rulemaking. But the SEC's order was arbitrary and capricious because it was conclusory and insufficiently reasoned. We thus grant Coinbase's petition in part. The remedy is not at this stage to order the SEC to institute rulemaking proceedings but to remand to the agency for a sufficiently reasoned disposition of Coinbase's petition.

---

[11]  We recognize, however, that digital assets are a growing part of the financial sector and are emerging as an increasingly important form of online payment. *See generally* Concurring Op. of Judge Bibas.

BIBAS, *Circuit Judge*, concurring.

I join the majority's excellent opinion in full. The Administrative Procedure Act lets agencies choose between rulemaking and adjudication. But they must explain their choice, and the SEC failed to do so.

I write separately only to consider a constitutional issue that is not yet teed up but that lurks beneath this statutory one. Nearly a century ago, Congress created the SEC to serve as a watchdog for securities markets, including by developing rules. The SEC insists that its old rules apply to the novel crypto market but refuses to spell out how.

Crypto companies like Coinbase are confused about how to comply with the law and have repeatedly asked the SEC to clarify. Instead of doing so, the SEC sues the companies individually. It wants to proceed with ex post enforcement without announcing ex ante rules or guidance. As I explain, its old regulations fit poorly with this new technology, and its enforcement strategy raises constitutional notice concerns.

## I. OLD RULES COLLIDE WITH A NEW INVENTION

### A. The old rules

Modern securities regulations flow from the Roaring '20s. In that bull market, stock prices soared. John Kenneth Galbraith, *The Great Crash 1929,* at 7–9, 11–12 (2009). But about half of new securities turned out to be worthless, or almost worthless, and the market crashed. Joel Seligman, *The Transformation of Wall Street* 1–2 (3d ed. 2003). That crash triggered the Great Depression. And as the Depression unfolded, academics and legislators probed its causes. Two stood out.

First, there were information problems. Stock sellers had lied or misled buyers, and investors sometimes learned that they had bought not a golden goose but a dead duck. Seligman at 44–49. Scholars realized a source of this problem: a company's ownership is separated from its control. *See, e.g.*, Adolf A. Berle, Jr. & Gardiner C. Means, *The Modern Corporation and Private Property* 1–125 (1933). Without accurate information, how can shareholders know that managers are not ripping them off? That core problem persists today.

Second, trading stocks creates financial risks. Many securities trades happen through middlemen: exchanges, brokerages, and clearinghouses. Before the Crash, some middlemen let investors gamble on credit with few restrictions. Galbraith at 20–22, 67–68. Though that credit fueled the stock market's rise, that same fuel helped burn it all down. *See id.* at 89–90, 103 (documenting the role of margin loans in the stock-market crash).

In response, Congress passed two blockbuster laws and created a new agency to enforce and administer them: the SEC. 15 U.S.C. §78d. First, the Securities Act of 1933 addressed the information problems. Laylin K. James, *The Securities Act of 1933*, 32 Mich. L. Rev. 624, 630, 632 (1934). Under the '33 Act, some securities issuers must register their securities and disclose important information to the public. *See* 15 U.S.C. §§77e (registration); 77g (required information in registration statement); 77j (required information in prospectus).

Second, the Securities Exchange Act of 1934 addressed the financial risks by regulating the financial system's plumbing. John Hanna & Edgar Turlington, *Protection of the Public Under the Securities Exchange Act*, 21 Va. L. Rev. 251, 257–61

(1935). The '34 Act regulates brokers, securities exchanges, and dealers, and requires them to register with the government. 15 U.S.C. §§ 78o(a)(1), 78e, 78f. It also regulates clearinghouses. § 78q-1.

Today, each part of the securities-trading system works together. Securities trade through intermediaries who move risks onto the parties best suited to bear them. Exchanges foster coordination and trust. They are platforms for buyers and sellers to coordinate what they are trading and at what price. Exchanges also decide what gets listed to trade. In doing that, they vet to make sure their wares are legal and high quality. *See* Will Kenton, *Exchanges: Explanation, Types and Examples*, Investopedia (July 31, 2020), https://perma.cc/Q9ZN-ALXZ.

The diagram below shows this structure, with an exchange linking buyers and sellers:



Imagine that you want to buy something on an exchange. If you cannot meet your counterparty in person, you must send him your money. There is a delay between when you do so and when you get the goods. But what if he takes the money and runs? That is called settlement risk.

That risk is absorbed by clearinghouses. They step between the buyer and seller, acting as a counterparty to each. Akhilesh Ganti, *Clearinghouse: An Essential Intermediary in the Financial Markets*, Investopedia (Feb. 7, 2023), https://perma.cc/JKQ3-JCG6. Each side can transact confidently because clearinghouses are trusted and regulated.



Because clearinghouses absorb risk from their counterparties, they need to ensure that those counterparties are trustworthy. That would be hard if anybody could trade on an exchange. But only members can. *See* 15 U.S.C. § 78f(c)(1); *see also, e.g.*, Temp. Dual FINRA-NYSE Member Rule 2T(a) (2019) (defining "member" as someone "approved … to effect transactions on the … Exchange"). And only registered brokers and dealers and their associates may become members. § 78f(c)(1). A broker sits between the buyer or seller and the exchange or clearinghouse. It takes custody of the buyer's or seller's assets and executes the trade when the customer says so. Tim Smith,

*Broker: Definition, Types, Regulation, and Examples*, Investopedia (Aug. 16, 2024), https://perma.cc/QZ95-ECVV.



Each entity faces its own suite of regulations. Those that fit one are unlikely to fit the others. For instance, a clearinghouse needs to hold capital reserves to guard against runs; but reserves make little sense for an exchange and would cause big compliance headaches. *See* 17 C.F.R. § 240.17ad-22(e)(4)(i).

This complicated system produced complicated regulations that are sensitive to how each piece of the system influences the next. But then a change hit: blockchain entered the game.

### B. A new invention

Eight decades after the Crash of '29, a coder pen-named Satoshi Nakamoto released a white paper proposing a novel digital currency named Bitcoin. Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3440802&download=yes. The idea was to change how people pay for things. Without financial institutions, buying something on the internet would be risky. Because the transaction is not face to face, each side would worry that the other would not pay up. *Id.* at 1. So financial institutions act as trusted middlemen. *Id.*

5

Nakamoto proposed a more efficient and secure solution: blockchain technology.

A blockchain is a decentralized ledger that tracks who owns what. It exists as copies on multiple computers; when one copy is changed on one system, every copy changes along with it. *What Is Blockchain?*, IBM, https://perma.cc/3VPD-NZRX. Transactions on this ledger are executed automatically and cannot be reversed. *Id.*; *see also* Chris Brummer, *Disclosure, Dapps and DeFi*, 5 Stan. J. Blockchain L. & Pol'y 137, 140 (2022). Blockchain solves the danger that a counterparty will not pony up. But if transactions are irreversible, the system must get them right. To do that, a blockchain validates every transaction to make sure it is correct. Each transaction on a blockchain is represented by a block and each block is linked to the others. Each new transaction adds a new block to the chain. To tell if the new block is valid, computers process a "hash" that works like a password. Nakamoto at 2. All of that requires computing power.

Enter coins. When someone lends his computing power to validate a transaction, the blockchain rewards him with the possibility of earning some Bitcoin or other coin. Because the process resembles "gold miners expending resources to add gold to circulation," it is called "mining." *Id.* at 4. Though new blockchains have since developed new processes to validate transactions, the incentive created by distributing digital currency remains the cornerstone of blockchains. *See* Amy Castor, *Ethereum Moved to Proof of Stake. Why Can't Bitcoin?*, MIT Tech. Rev. (Feb. 28, 2023), http://perma.cc/7QAZ-EAL9.

People took Nakamoto's idea and built on it. Blockchains are now used to run programs, and applications are built on top of them. *See* Brummer at 141. So blockchains act not only as ledgers, but also as the infrastructure supporting complex processes. These "decentralized" applications issue "tokens," a different type of crypto asset. Andrew Loo, *Types of Cryptocurrency*, CFI, https:/perma.cc/95TD-6ZR5. As the majority notes, these tokens may entitle the holder to governance rights "within a cryptocurrency network," to a service offered by the issuer (a bit like a gift card), or to something else entirely. *Id.*

## II. POURING NEW CRYPTO WINE INTO OLD REGULATORY BOTTLES

The SEC says that cryptocurrencies must comply with existing securities regulations. But applying the old securities regulations to this new technology raises thorny questions. Are crypto assets really securities at all? If so, which ones? And, from a practical standpoint, how do the regulations fit them?

### A. When are crypto assets securities, commodities, or something else?

To tell if an unconventional arrangement is a security (an "investment contract"), we use the *Howey* test. 15 U.S.C. § 78c(a)(10); *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–99 (1946). *Howey* deems something an investment contract if it involves (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) from someone else's effort. *Howey*, 328 U.S. at 298–99.

Since *Howey*, the Supreme Court has applied this definition to various creative agreements to discern if they were disguised

securities. These include "withdrawable capital shares" that look a lot like stock and payphone sale-and-leaseback arrangements. *Tcherepnin v. Knight*, 389 U.S. 332, 333, 339–40 (1967) (capital shares); *SEC v. Edwards*, 540 U.S. 389, 391, 397 (2004) (payphones).

Lower courts have confronted even more creative schemes: a pyramid scheme in which people bought rights to sell cosmetics and earned money by recruiting salesmen, an online game that mimicked stock trading but for imaginary companies, and the sale of life-insurance contracts held by the terminally ill. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 474–75, 478 (5th Cir. 1974) (cosmetics-selling pyramid scheme); *SEC v. SG Ltd.*, 265 F.3d 42, 44, 48 (1st Cir. 2001) (stock-trading game); *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738, 745 (11th Cir. 2005) (life insurance). In each case, a lower court found either that the defendant was offering securities or that the SEC had alleged facts that, if true, would amount to offering securities. *Koscot*, 497 F.2d at 485–86; *SG Ltd.*, 265 F.3d at 55; *Mut. Benefits Corp.*, 408 F.3d at 745.

Some crypto assets are likewise nothing but creative schemes to evade securities regulations. Take a crypto asset that comes with an exclusive deal to lend it out at a high interest rate. *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 195–96 (S.D.N.Y. 2023). Or take one that entitles holders to voting rights and dividends. *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Exchange Act Release No. 81207, 2017 WL 7184670, at *2–3 (July 25, 2017) (*DAO Report*).

But not all crypto assets fit this mold. Some resemble bank accounts, others seem like commodities, and still others defy traditional labels altogether.

Take stablecoins. They are crypto tokens whose value is pegged to something else, like the dollar. Gary B. Gorton & Jeffery Y. Zhang, *Taming Wildcat Stablecoins*, 90 U. Chi. L. Rev. 909, 915–17 (2023). Speculation in cryptocurrencies makes their prices volatile, and volatility makes currency a poor store of value. Stablecoins promise to solve that problem. An issuer sells them to the public and promises to use the money to buy and hold safe assets. *Id.* Then, anyone can redeem a stablecoin on demand for its cash equivalent. *Id.* at 915. So stablecoins work a lot like demand deposits, and their issuers "are essentially unregulated banks." *Id.* at 929. If it works like a bank account, then maybe it should be regulated by bank regulators, not the SEC.

Other crypto assets lack central promoters and so look more like currencies or commodities. Take Ether, a coin issued on the Ethereum blockchain. Ethereum goes a step beyond the Bitcoin blockchain by letting programmers create decentralized applications that run on its blockchain. Vitalik Buterin, *Ethereum: A Next-Generation Smart Contract and Decentralized Application Platform* 1 (2014), https://perma.cc/A5DY-XNXH. To validate a transaction facilitated by one of these decentralized applications, a user must pay a "gas" fee in Ether coins. *Id.* at 13–14. These coins are then paid to the person who lent his computing power to validate the change to the blockchain. *See id.* Because Ether has a specific practical function in the private economy, it works a lot like a commodity. But unlike

9

a commodity, when used, it is not consumed. Instead, it is paid to someone else for services rendered, like a currency.

Whether Ether works more like a commodity or more like a currency, it certainly does not work like a security. That is because it is now fully decentralized, so there is no third-party promoter. True, investors may speculate in Ether, but they also speculate in oil, gold, pork bellies, and the U.S. dollar. These characteristics explain why the Commodity Futures Trading Commission has staked a claim to regulate some crypto assets. *See* Complaint ¶ 21, *CFTC v. Bankman-Fried*, 1:22-cv-10503 (S.D.N.Y. Dec. 13, 2022) ("Certain digital assets are 'commodities,' including bitcoin (BTC), ether (ETH), tether (USDT) and others.").

Still other crypto assets have no clear traditional analogue. Take "utility tokens" or "service tokens." Decentralized applications on blockchains sometimes issue tokens that entitle their holders to goods or services. For instance, Filecoin holders can rent data-storage space from people who have free space on their hard drives. *See* Filecoin Found., *Filecoin Foundation 2023 Annual Report* 18, https://www.figma.com/proto/OpRYFQO34ycc5N7YIMe-GAe/2023-FF-Annual-Report?node-id=1-11370. Some people may have bought Filecoin expecting the service to succeed and the coin's value to rise. Relying on a third party's efforts to turn a profit looks somewhat like buying a security. *See Howey*, 328 U.S. at 299. But the analogy is strained because the token also entitles them to a service. Is the purchase made for consumption or for investment? And once a decentralized application or blockchain takes off, that question is no longer relevant. It no longer needs a third party to promote it and so is no longer even

plausibly a security. This suggests that some crypto assets could be securities in infancy and something else in adulthood. But, as I explain below, classifying them as securities could strangle them in their cribs.

In sum, not all crypto assets are the same. And their differences matter when evaluating whether a crypto asset is a security.

## B. The '33 and '34 Acts fit crypto awkwardly

The '33 Act's disclosure requirements do not fit many crypto assets. The '33 Act levels the playing field for investors by making securities issuers disclose all sorts of important information. 15 U.S.C. § 78o(d)(1). For instance, public companies must put out audited financial statements stating the names of their corporate directors and officers and whether those directors are independent. *See Form 10-K*, SEC, https://perma.cc/5UBJ-FD5F. But for many crypto assets, that information is nonexistent or meaningless. Instead, owners might care more about how they can use a token or how the relevant blockchain's code might be changed. *See* Brummer at 146–49. Even if the disclosures would be useful, who should make them? Once crypto assets become decentralized, is there a single party who even has access to all the required information?

The same is true of the '34 Act's rules. A key term in that Act and its regulations is the word "physical." Brokers and dealers must keep "physical possession or control" of the assets with which they are entrusted. 17 C.F.R. § 240.15c3-3(b). Because crypto assets cannot be physically delivered, it is unclear whether brokers and dealers can deal in them. Meanwhile, the Act defines a "clearing agency" as, among other things, anyone who "permits or facilitates the settlement of securities

11

transactions … *without* physical delivery of securities certificates." 15 U.S.C. §78c(a)(23)(A) (emphasis added). But crypto assets do not have physical certificates, so almost anyone involved in validating a crypto transaction could count as a "clearing agency." Clearing agencies have heavy burdens: they must register with the SEC, create risk-management systems, and monitor their counterparties. 15 U.S.C. §78q-1(b)(1); 17 C.F.R. §240.17ad-22. Even that first step poses problems—who is supposed to register?

Exchanges complicate the picture even more. One potential promise of blockchain is to eliminate settlement risk, bypassing the clunky system of intermediaries. People could use decentralized exchanges to avoid concentrated risk and transform how assets trade. *See generally* Lindsay X. Lin, *Deconstructing Decentralized Exchanges*, 2 Stan. J. Blockchain L. & Pol'y 58 (2019). True, the technology has not yet realized that promise. Coinbase itself is largely a centralized exchange, using a single ledger rather than blockchain. *See* Coinbase Global, Inc., *Annual Report (Form 10-K)* 10, 34 (Feb. 15, 2024). But the future is open to such innovation unless clunky legacy regulation stifles it. *See* Hester M. Peirce, Comm'r, SEC, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange* (Apr. 14, 2023) ("Today's [SEC] treats its basic approach to exchange regulation as something that must not—indeed cannot—be altered to allow room for new technologies or for new ways of doing business.").

That is not some far-off scenario; it is the status quo. *Id.* An exchange hosting "any transaction in a security" must register with the SEC as a securities exchange. 15 U.S.C. §78e. Neither brokers nor dealers may trade on an unregistered exchange. *Id.*

12

But decentralized exchanges, like current exchanges for crypto assets, have no centralized entity to complete the registration, so they cannot comply.

To its credit, the SEC has tried to handle part of the physical-control problem. Through February 2026, the Commission will not bring enforcement actions against broker-dealers who transact in crypto assets without physically possessing or controlling them. *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, Exchange Act Release No. 34-90788, 86 Fed. Reg. 11627, 11628 (Feb. 26, 2021). This is progress, but so far only one entity has managed to register. Pet'r's Br. 45.

But the SEC has not tried to resolve the clearinghouse problem. And it has doubled down on the exchanges problem, proposing to treat some decentralized crypto exchanges as securities exchanges or even dealers. *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* Exchange Act Release No. 34-97309, 88 Fed. Reg. 29448, 29449–58 (May 5, 2023); *Further Definition of "As Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers*, Exchange Act Release No. 34-99477, 89 Fed. Reg. 14938, 14960 (Feb. 29, 2024).

### III. THE SEC'S POSITION ON HOW THE OLD APPLIES TO THE NEW IS UNCLEAR

### A. Originally, the SEC took a light touch with crypto

The SEC did not start policing crypto assets until about 2017, nine years after Bitcoin was introduced. In the early 2010s, it brought a few enforcement actions in fraud cases that

13

involved crypto only tangentially, usually when a fraudster got paid in crypto assets. *See, e.g.*, *SEC v. Shavers*, No. 13-CV-416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014); Complaint, *SEC v. Garza*, No. 15-cv-1760 (D. Conn. Dec. 1, 2015). Those cases alleged straightforward securities frauds that coincidentally relied on crypto assets as a medium of exchange; they did not allege that the crypto assets themselves were securities.

In 2017, the SEC started targeting crypto assets as securities, focusing on those that looked like substitutes for issuing stock. First, it released the DAO Report, stressing that crypto assets that grant part of an organization's profits along with governance rights count as investment contracts under the *Howey* test. *DAO Report* at *7–12. But that report was silent on other crypto assets.

Around this time, SEC officials spoke publicly about how they viewed crypto assets. William Hinman, director of the corporate-finance division, noted that Bitcoin and Ether do not appear to be securities and that disclosure requirements make little sense for them. William Hinman, Dir., Div. of Corp. Fin., Sec. & Exch. Comm'n, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018). At the same time, he worried that some utility-token offerings are really securities marketed as investments. *Id.* So in his view, an initial coin offering could be a security offering even if some people buy it for its underlying utility.

Hinman's thinking aligned with some of the SEC's enforcement post-2017. While most of it still focused on crypto assets that worked just like stock, the SEC also went after a few utility tokens. The premise was that utility tokens sold in initial coin

14

offerings would appreciate. *See, e.g.*, *In re CarrierEQ, Inc.*, Securities Act Release No. 10575 (Nov. 16, 2018); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 176, 179–80 (S.D.N.Y. 2020) (suit filed in 2019); *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 326–28 (S.D.N.Y. 2023) (suit filed in 2020); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 217 (D.N.H. 2022) (suit filed in 2021). In all these enforcement actions, the SEC argued that buying a token for its future usefulness and appreciation is just an investment contract.

On that theory, almost all crypto assets would count as securities. But the SEC did not go after many crypto assets. Nor did it issue a rule or further guidance to clarify its views on utility tokens. Instead, it pursued a patchwork of enforcement actions against crypto assets, focusing on serious fraud. So for the next few years, thousands of initial coin offerings went off without a hitch, and the crypto market swelled to $3 trillion.

### B. Only after crypto crashed did the SEC clamp down

Until 2022, crypto prices soared, fueled in part by pandemic-era expansionary monetary policy. *See* Cristina Polizu et al., S&P Glob., *Are Crypto Markets Correlated with Macroeconomic Factors?* 6–7 (May 2023), https://perma.cc/MXK5-WZ8M (documenting the relationship between quantitative easing and crypto prices). But then, inflation and interest rates rose. The bubble popped, as bubbles do, and crypto prices cratered. In mid-2022, an algorithmic stablecoin called Terra crashed, portending worse. Jiageng Liu, Igor Makarov & Antoinette Schoar, *Anatomy of a Run: The Terra Luna Crash* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31160, 2023). Depressed crypto prices eventually contributed to the

collapse of FTX, a crypto exchange that turned out to be a fraud. Max Zahn, *A Timeline of Cryptocurrency Exchange FTX's Historic Collapse*, ABC News (Mar. 28, 2024), https://perma.cc/YCN9-K9DJ.

Suddenly, the crypto mania took on a darker tone, and the SEC changed its tune. In September 2022, when crypto prices were down about 70% from their peak, Chairman Gary Gensler stated: "Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities." Gary Gensler, Chair, Sec. & Exch. Comm'n, Kennedy and Crypto (Sept. 8, 2022); *see also Crypto Total Market Cap, $*, TradingView, https://perma.cc/2Y5B-5DWK (showing decline in crypto prices); *Global Cryptocurrency Market Cap Charts*, CoinGecko, https://www.coingecko.com/en/global-charts.

In the two years since the FTX crash, the SEC has pursued a new and aggressive enforcement campaign against crypto:

- Chairman Gensler doubled down: "Everything other than bitcoin …. [T]hese tokens are securities." Ankush Khardori, *Can Gary Gensler Survive Crypto Winter?*, N.Y. Mag. (Feb. 23, 2023), https://perma.cc/J5ZB-RRWM.

- Then the SEC investigated a stablecoin. *Paxos Issues Statement*, Paxos (Feb. 13, 2023), https://perma.cc/QF9S-G7B7.

- Then it investigated developers who use Ethereum, the blockchain for Ether. Jeff John Roberts, *Ethereum Wins a Major Battle Against the SEC, but Gensler's War Rages On*, Yahoo! Fin. (June 21, 2024), https://perma.cc/2SZ6-5LF2.

- And it launched suits against crypto exchanges, arguing that they list securities. *See* Jinwan Cho, *Cryptocurrency*

16

*Under the Gavel: The Implications of SEC Lawsuits Against Binance and Coinbase*, Colum. Sci. & Tech. L. Rev. (Mar. 3, 2024), https://perma.cc/M24W-9R3P.

### C. Now the SEC refuses to take a clear stance

The surge in enforcement prompted many in the crypto market to seek clearer guidance from the SEC about how crypto would be regulated. One can hardly blame them. Consider a few examples of the SEC's contradictory signals:

- The SEC sued two exchanges, Coinbase and Binance, *one day apart*. Betraying internal inconsistency, it named six crypto assets as securities in the Coinbase suit that Binance also lists, but without targeting them in the Binance suit. Conversely, it named three tokens in the Binance suit that Coinbase also lists, without targeting them in the Coinbase suit. *Compare* Compl. ¶114, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. June 6, 2023) (calling CHZ, DASH, FLOW, ICP, NEAR, and NEXO securities) (*Coinbase* Compl.), *with* Compl. ¶352, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599 (D.D.C. June 5, 2023) (calling ATOM, COTI, and MANA securities) (*Binance* Compl.). It is hard to explain the inconsistency. The SEC did not have to sift through enormous amounts of assets in either suit. When it sued Coinbase, it focused on only fifteen of the hundred crypto assets listed on Coinbase. And it picked out only ten of Binance's. True, the SEC did qualify the complaints by saying: "This includes, but is not limited to," before calling out specific assets by their trading symbols. *Coinbase* Compl. ¶114; *Binance* Compl. ¶

352. But it is confusing at best that the SEC called out different assets by name as securities in suits filed a day apart.

- The SEC is not suing the issuers of these crypto assets, but only the exchanges. And it is taking legal action only *after* the exchanges list an asset that the SEC thinks is a security.

- Some brokers, like eToro and Cumberland, have tried to work with the SEC to broker crypto assets. They accepted Chairman Gensler's invitation to "come in and register," but after registering they were told that they could not deal in any crypto assets except Bitcoin and Ether. Matt Levine, *The Trump Trades Worked*, Bloomberg (Nov. 6, 2024), https://perma.cc/S3KM-PS72.

- At oral argument in this very case, the SEC's lawyer refused to say whether Bitcoin and Ether are securities, saying only that he was "not aware of the Commission statement about the status of Bitcoin as a whole" and that "there's not an answer to [the] question" "whether Bitcoin … is subject to the federal securities laws as part of an investment contract." Oral Arg. Tr. 24, 32. That evasiveness is puzzling. Earlier in the year, when the SEC approved an exchange-traded fund that tracks the price of Bitcoin, the agency seemed to say the opposite: that Bitcoin is a "non-security commodity." Gary Gensler, Chairman, SEC, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products* (Jan. 10, 2024).

## IV. THE SEC'S FOGGINESS DEPRIVES CRYPTO COMPANIES OF FAIR NOTICE

The SEC repeatedly sues crypto companies for not complying with the law, yet it will not tell them how to comply. That caginess creates a serious constitutional problem; due process guarantees fair notice. "[R]egulated parties should know what is required of them so they may act accordingly ...." *FCC v. Fox TV Stations*, *Inc.*, 567 U.S. 239, 253 (2012).

Usually, agency rulemaking is preferable to case-by-case enforcement because it clarifies the law ahead of time. "The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 202 (1947). But an agency may choose to pursue its aims through ex post enforcement rather than ex ante rulemaking. *Id.* Sometimes, a scalpel works better than a sledgehammer for those "specialized problems" whose solutions cannot "be cast immediately into the mold of a general rule." *Id.* For instance, in labor law, employers' circumstances vary so greatly that "[i]t is doubtful whether any generalized standard could be framed which would have more than marginal utility." *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974). Ordinarily, the agency gets to choose which path to take. *Id.* ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion.").

But while the APA lets agencies choose enforcement, the Constitution's due-process requirements still protect defendants. Laws that punish and deter must meet due process's

heightened notice requirements. "[T]he standards of due process" do not turn on "the simple label [Congress] chooses to fasten upon … its statute." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966). They turn on what the law *does*. *See, e.g.*, *Fox*, 567 U.S. at 253–54 (applying the criminal law's fair-notice requirements to an agency's civil enforcement action). So due process's heightened notice requirements apply not only to criminal laws, but also to others that seek only to punish and deter.

And the SEC is using the federal securities laws against the crypto industry to do just that. Its earlier enforcement actions against fraudsters sought to compensate victims. But now, in suing exchanges, the SEC has pursued injunctions, fines, and disgorgement. *See, e.g.*, *Coinbase* Compl. at 99–100; *Binance* Compl. at 134–35. No victims are evident, yet the agency keeps seeking penalties. It targets not just fraudsters, but also the infrastructure on which much of the crypto industry relies.

To be sure, the SEC seeks regulatory penalties, which are usually called civil. But they are functionally criminal. They go beyond compensating victims to deter and punish. And when a defendant lacks notice of them, they cannot serve these purposes: one cannot deter or fairly blame the defendant who does not know what the law forbids. This is why Congress may create retroactive *compensatory* liability, but the "[r]etroactive imposition of *punitive* damages would raise a serious constitutional question." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281 (1994) (emphasis added); *accord Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976) ("[W]e would nevertheless hesitate to approve the retrospective imposition of liability on any theory of deterrence or blameworthiness." (citations omitted)).

So the SEC's haphazard enforcement strategy of targeting entities that are trying to follow the law does not give potential defendants the notice that due process requires. That is especially true because the field is novel. The agency has offered no meaningful guidance on which crypto assets it views as securities. The *DAO Report* gives guidance only about the clearest crypto assets: tokens that look just like stocks. But what about stablecoins, utility tokens, or even Bitcoin and Ether? Existing rules do not fit blockchain technology, but the SEC refuses to recognize this. Its official silence and contradictory unofficial signals breed uncertainty. Crypto issuers and exchanges are left to cross their fingers and pray that the agency does not fault them.

Yet that is cold comfort under the SEC's current crypto enforcement strategy. As one financial journalist put it, through this strategy, SEC Chairman Gary Gensler is practically saying: "I should be the main regulator of crypto, and as the main regulator my plan is mostly to ban it." Matt Levine, *Gary Gensler Wants to Regulate Crypto*, Bloomberg (Sept. 8, 2022), https://perma.cc/C8KX-DX6S.

If the SEC were to promulgate a rule banning crypto assets, it would surely face legal challenges. One might wonder if an agency whose mission is maintaining fair, orderly, and efficient markets is authorized to ban an emerging technology. *See West Virginia v. EPA*, 597 U.S. 697, 744 (2022) (Gorsuch, J., concurring) ("[A]n agency must point to clear congressional authorization when it seeks to regulate a significant portion of the American economy …." (internal quotation marks omitted)). So the SEC has sidestepped the rulemaking process by pursuing a de facto ban through enforcement instead. By combining regulatory uncertainty with unpredictable enforcement

against the infrastructure for trading crypto, it can get near-total deterrence.

This case makes obvious the bind that defendants face. In its briefing, the best that the SEC could muster to guide parties is that a crypto asset is a security when "the facts and circumstances" say so—in other words, when the *Howey* test says so. Resp't's Br. 26. But the crypto industry is confused about *how* the SEC thinks that test applies.

Coinbase filed this petition because it wanted to understand what the SEC considers a security and how to follow the law. Before listing a crypto asset, the company screens it using a questionnaire that tracks *Howey*'s four prongs. *Coinbase Compl.* ¶¶106–10. But until the company knows how the SEC applies the ill-fitting *Howey* test, it cannot always get it right. While the SEC was reviewing Coinbase's petition, it sued Coinbase for listing unregistered securities. And it used Coinbase's screening process as evidence that the company was on notice—after all, its survey proved that Coinbase knew about the *Howey* test. *Id.* If that is the reward for trying to comply with the SEC's likely positions, then why try at all?

In this posture, Coinbase's constitutional concern is premature. As the SEC rightly points out, "fair notice is a defense that defendants may attempt to assert to enforcement in certain circumstances. [It is] not a basis for mandating rulemaking." Resp't's Br. 40. This is a petition to review a denial of rulemaking, not an appeal from an enforcement action, so the issue is not squarely before us. Rather than force the agency to make a rule, we order it to explain its decision not to. Indeed, a rule may

not prove necessary to solve the notice problems here; the agency could just state its position on crypto assets unequivocally.

When courts confront such enforcement-by-surprise in future cases, they must bar penalties that were not reasonably foreseeable. *Cf. Franklin v. Navient, Inc.*, 534 F. Supp. 3d 341, 347–48 (D. Del. 2021) (allowing compensatory damages but barring civil penalties for actions that violated an unforeseeable change in the law). The SEC may not play gotcha, and Article III courts must ensure that the SEC plays fair.

\* \* \* \* \*

We properly remand to the SEC to explain itself; it should not give yet another poor explanation in an already-long line of them. New inventions create new fraud risks, and the agency needs to guard against them. But sporadically enforcing ill-fitting rules against crypto companies that are trying to follow the law goes way beyond fighting fraud. It targets a whole industry and risks de facto banning it. On remand, the SEC must grapple with that problem.